1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

8  GRAND CANYON SKYWALK DEVELOPMENT )
   LLC, *et al.*,                          )
9                                          )
          Plaintiffs,                      )   Case Nos.:  2:15-cv-01189-JAD-GWF
10                                         )               2:13-cv-00596-JAD-GWF
11 vs.                                     )
                                           )   **ORDER**
12                                         )
   DAVID JOHN CIESLAK, NICHOLAS SCUTARI )
13 and SCUTARI & CIESLAK PUBLIC           )
   RELATIONS, INC.                         )
14                                         )
          Defendants.                      )
15 _____)

16         This matter is before the Court on Gallagher & Kennedy, P.A. and The Hualapai Indian

17 Tribe's (hereinafter "Gallagher & Kennedy") Motion to Quash Plaintiff's Subpoena to Glen

18 Hallman (#1), filed on May 28, 2015.  Plaintiffs filed their Opposition (#21) on June 29, 2015.

19 Gallagher & Kennedy filed its Reply (#23) on July 17, 2015.  The Court conducted a hearing in this

20 matter on July 22, 2015.

21                              **BACKGROUND**

22         This action arises out of a long-running dispute relating to the Grand Canyon Skywalk

23 ("Skywalk").  *See Order (#125)* in Case No. 2:13-cv-00596-JAD-GWF.  Plaintiffs allege that

24 Defendants David John Cieslak, Nicholas Peter Scutari and Scutari & Cieslak Public Relations,

25 Inc. (hereinafter collectively referred to as "Scutari & Cieslak"), together with individual members

26 of the Hualapai Tribal Council, conspired to conduct a public relations/news media campaign to

27 falsely accuse the Plaintiffs of having breached their contracts with the Hualapai Tribe.  The

28 alleged purpose of the conspiracy was to gain support for the Tribal Council's enactment of an

eminent domain ordinance and the subsequent condemnation of Plaintiffs' contractual rights. Plaintiffs allege that the Tribe hired Scutari & Cieslak to formulate the public relations campaign against Plaintiffs. As part of this campaign, Scutari & Cieslak, or Tribal officials following scripts prepared by Scutari & Cieslak, falsely stated that Plaintiffs breached their contract "to complete certain critical elements of the Skywalk – including water, sewer and electricity" when, in fact, it was the Tribe's responsibility to provide these elements. Defendants also allegedly made other statements that impugned the honesty of Plaintiffs. *Complaint (#1)*, ¶¶ 60-80. Scutari & Cieslak allege as an affirmative defense that they acted in good faith upon advice of counsel in making the allegedly defamatory statements. *Answer to Complaint (#70), pg. 12.* The counsel referred to in this affirmative defense were attorneys in the law firm of Gallagher & Kennedy who represented the Tribe and its officers in the various disputes and litigation with Plaintiffs.[1]

This Court previously denied Gallagher & Kennedy's motion to quash a subpoena duces tecum served by Defendants Scutari & Cieslak which seeks documents relating to communications between Gallagher & Kennedy and Scutari & Cieslak. *Order (#125).* Gallagher & Kennedy filed an objection to the undersigned's order on June 19, 2015 which is currently pending before the District Judge. The instant motion to quash involves a deposition subpoena that Plaintiffs served on Glen Hallman, an attorney who was formerly employed by Gallagher & Kennedy. Mr. Hallman engaged in communication with Scutari & Cieslak with respect to the statements that were published about the Plaintiffs. Plaintiffs state that they seek only to question Mr. Hallman about his communications with Scutari & Cieslak. They do not seek to discover privileged communications between the Tribe and Mr. Hallman. *Opposition (#21), pgs. 2, 6.*

Gallagher & Kennedy states that as part of its representation of the Tribe, it recommended that the Tribe hire Scutari & Cieslak to manage media contacts in connection with the litigation. *Motion (#1), pg. 2.* It also states that Mr. Hallman was "an attorney assisting the Tribe in carrying

---

[1] Scutari & Cieslak have also filed a third party complaint against the Hualapai Tribe for equitable indemnity, contribution, and/or express contractual indemnity for any liability they may incur to Plaintiffs in this action. The Hualapai Tribe has filed a motion to dismiss the third party complaint based on tribal sovereign immunity.

out its fundamental sovereign and legislative powers, including the exercise of eminent domain. Because this role was in the nature of an official function involving matters of internal governance, the Tribe's immunity extends to him and this Court has no jurisdiction to compel compliance with the subpoena." *Reply (#23), pg. 2.*  Gallagher & Kennedy also argues that Mr. Hallman's communications with Scutari & Cieslak are protected from disclosure by the Tribe's attorney-client privilege and by the attorney work-product doctrine.

### DISCUSSION

**A.    Whether the Subpoena is Unenforceable Under the Doctrine of Tribal Sovereign Immunity.**

Indian tribes are domestic dependent nations that exercise inherent sovereign authority. *Michigan v. Bay Mills Indian Community*, ___ U.S. ___, 134 S.Ct. 2024, 2030 (2014).  As dependents, the tribes are subject to plenary control by Congress.  The Constitution grants Congress power to legislate with respect to Indian tribes and yet they remain separate sovereigns pre-existing the Constitution.  Thus, unless and until Congress acts, Indian tribes retain their historic sovereign immunity which includes the common law immunity from suit traditionally enjoyed by sovereign powers.  *Id.*  In *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700 (1998), the Court held that an Indian tribe's sovereign immunity applies to the tribe's commercial activities with non-tribal parties.  The Court noted that while there were reasons to doubt the wisdom of perpetuating the doctrine of tribal sovereign immunity, it has become established and the Court declined to restrict it in deference to Congress's right to legislate in the area.  *Id.*, 523 U.S. at 758-760, 118 S.Ct. at 1705.

Tribal sovereign immunity "'extends to tribal officials when acting in their official capacity and within the scope of their authority.'" *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 727 (9th Cir. 2008), quoting *Linneen v. Gila River Indian Community*, 276 F.3d 489, 492 (9th Cir. 2002).  In such cases, the sovereign entity is the real party in interest and is entitled to invoke sovereign immunity even though individual officials are nominal defendants.  *Id.*, citing *Regents of the University of California v. Doe*, 519 U.S. 425, 429, 117 S.Ct. 900 (1997).  *Cook* also held that tribal sovereign immunity extends beyond tribal officials to tribal employees when acting in their

1    official capacity and within the scope of their authority.  The court agreed with the Second Circuit's

2    decision in *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004) that "[t]he principles that motivate

3    the immunizing of tribal officials from suit—protecting an Indian tribe's treasury and preventing a

4    plaintiff from bypassing tribal immunity merely by naming a tribal official—apply just as much to

5    tribal employees when they are sued in their official capacity." *Id.*

6         Tribal sovereign immunity does not, however, bar suits brought against tribal employees in

7    their individual capacities. *Maxwell v. County of San Diego*, 708 F.3d 1075, 1087-88 (9th Cir.

8    2013). *Maxwell* notes that tribal sovereign immunity derives from the same common law immunity

9    principles that shape state and federal sovereign immunity.  A suit brought against federal, state or

10   tribal officers or employees in their individual capacities does not implicate sovereign immunity

11   because the plaintiff seeks money damage not from the government, state or tribal treasury but from

12   the individual defendants personally.  Due to the essential nature and effect of the relief sought, the

13   sovereign is not the real, substantial party in interest in individual capacity lawsuits.  The court

14   further stated that it saw "no reason to give tribal officers broader sovereign immunity protections

15   than state or federal officers given that tribal sovereign immunity is coextensive with other

16   common law immunity principles." *Id.* at 1089.

17        An attorney acting in his official capacity as legal advisor to the tribe on matters of tribal

18   governance and within the scope of his authority is entitled to the protection of tribal sovereign

19   immunity. *Davis v. Littell*, 398 F.2d 83 (9th Cir. 1968).  A tribal attorney, however, may be held

20   liable in the same manner that other tribal officials or employees may be held liable in their

21   individual capacities. *Stock West Corp. v. Taylor*, 942 F.2d 655, 666-67 (9th Cir. 1991).  Plaintiffs

22   have not brought an action against Gallagher & Kennedy or Mr. Hallman for the recovery of

23   damages.  Instead, Plaintiffs and Defendants have served subpoenas on Gallagher & Kennedy and

24   Mr. Hallman to obtain documents and testimony relevant to the claims and defenses in Plaintiffs'

25   lawsuit against Scutari & Cieslak.  The only issue before this Court, therefore, is whether tribal

26   sovereign immunity protects Mr. Hallman from being required to testify as a witness in this action.

27        The federal appeals courts that have addressed the issue, agree that a subpoena served on a

28   non-party Indian tribe is barred by tribal sovereign immunity.  There is disagreement, however,

4

whether non-party tribal officers or employees are immune from compliance with subpoenas directed to them. *United States v. James*, 980 F.2d 1314, 1319 (9th Cir. 1992); *Alltel Communications, LLC v. DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012); and *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014).   In *James*, the Ninth Circuit held that an Indian tribe was not required to comply with a subpoena duces tecum served by a defendant in a federal criminal prosecution unless the tribe had waived its sovereign immunity.  Although the subpoena was directed "toward Richard Martinez, Director of Social Services of the Quinault Indian Nation," the court did not state whether there was any distinction between a subpoena directed to the tribe itself versus one directed to a tribal officer or employee, including a custodian of tribal records.

In *Alltel Communications, LLC v. DeJordy*, the plaintiff in a private civil action against its former vice president, served a subpoena duces tecum on an Indian tribe.  The Eighth Circuit held that a federal court subpoena served on a non-party Indian tribe in civil litigation is barred by tribal sovereign immunity.  Although *Alltel* did not specifically hold that a subpoena served on a tribal official or employee would also be barred, it indicated that this could be the result of its decision. In discussing the reason why a third party subpoena impinges on a tribe's sovereignty, the court cited the Fourth Circuit's decision in *Boron Oil Co. v. Downie*, 873 F.2d 67, 70-71 (4th Cir. 1989) regarding the disruptive effect of a subpoena directed to federal agency officials.  *Alltel*, 675 F.3d at 1103.

*Alltel* noted that the adverse affect of sovereign immunity on the ability to obtain discovery from non-party federal agencies or officials is ameliorated by the statutory waiver of sovereign immunity in 5 U.S.C. § 705.  *Id.* at 1103, citing *Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C.Cir. 2001).  *Linder*, in turn, cited *Exxon Shipping Co. v. U.S. Department of Interior*, 34 F.3d 774, 778 (9th Cir. 1994) and *COMSAT Corp. v. National Science Foundation*, 190 F.3d 269 (4th Cir. 1999).  *See also U.S. E.P.A. v. General Elec. Co.*, 197 F.3d 592, 598-99 (2d Cir. 1999). Because there is no comparable statutory waiver of sovereign immunity with respect to Indian tribes, the court noted that a decision in favor of the tribe "may well confer greater immunity than that enjoyed by federal officers and agencies, or by the States whose sovereign immunity is

1   protected by the Eleventh Amendment."  675 F.3d at 1104.

2       In *Bonnet v. Harvest (U.S.) Holdings, Inc.*, the Tenth Circuit also held that a subpoena

3   served on a non-party Indian tribe in a private civil action was barred by tribal sovereign immunity.

4   The court stated in dicta, however, that it "[saw] no reason why an Indian tribe should be able to

5   'shut off an appropriate judicial demand for discovery' served on a tribal official, rather than

6   against the Tribe itself."  741 F.3d at 1161-62.  The court noted that "under *Ex parte Young*, 209

7   U.S. 123, 28 S.Ct. 441 (1908), which applies with equal force against both state and tribal officials

8   under *Crowe & Dunlevy*, 640 F.3d at 1154, neither a state nor a tribe would appear to be immune

9   from a discovery request served on the appropriate agency official, rather than on the agency itself,

10  although other privileges or protections may apply."  The court stated that a subpoena served on a

11  tribal official would not trigger tribal sovereign immunity because "'[t]he *Ex parte Young*

12  exception proceeds on the fiction that an action against a state official seeking only prospective

13  injunctive relief is not an action against the state and, as a result, is not subject to the doctrine of

14  sovereign immunity.'"  *Id.* at 1162, n. 1.[2]

15      The court in *Caskill Development v. Park Place Entertainment*, 206 F.R.D. 78 (S.D.N.Y.

16  2002) held that tribal sovereign immunity protected tribal officials, including two of the tribe's

17  attorneys, from being required to comply with subpoenas to produce documents or testify on

18  matters arising from their official duties.  *Id.*, at 87-88.  The court did not address the application of

19  *Ex Parte Young*, but instead relied on *U.S. E.P.A. v. General Elec. Co.*, 197 F.3d 592 (2d Cir.

20  1999) which held that in the absence of waiver, sovereign immunity prevented enforcement of a

21  subpoena against a federal agency official.  The court in *Bonnet* noted, however, that "'because of

22  the peculiar 'quasi-sovereign' status of the Indian tribes, the Tribe's immunity is not congruent

23  with that which the Federal Government, or the States, enjoy.'"  *Bonnet*, 741 F.3d at 1160, quoting

24  *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890, 106 S.Ct.

25

26      [2] In *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154-55 (8th Cir. 2011), the court held that
27  the *Ex Parte Young* doctrine may be applied against a tribal official to enjoin a violation of federal common
    law, as well as violations of federal constitutional or statutory law.  The dicta in *Bonnet* suggests that a
28  federal district court may also apply the doctrine to enforce compliance with federal procedural rules.

2305, 90 L.Ed.2d 881 (1986). *Crowe & Dunlevy v. Stidham*, 640 F.3d at 1154, further states that tribal sovereign immunity is even more limited than state sovereign immunity because it is a matter of federal common law and not a constitutional guarantee. Thus, it can be fairly argued that the scope of tribal sovereign immunity is more comparable to that enjoyed by the states and their respective officers and employees, than it is to the immunity enjoyed by the greater sovereign, the United States of America and its agencies and officers.

The Ninth Circuit has not articulated whether the *Ex Parte Young* doctrine applies to a subpoena to a state official seeking documents or information relevant to the claims or defenses in a civil action in federal court. Some district courts have addressed the issue. In *Estate of Gonzalez v. Hickman*, 466 F.Supp.2d 1226 (E.D.Cal. 2006), the plaintiffs filed a §1983 civil rights action against state prison officials. The plaintiffs served subpoenas on the California Department of Corrections and Rehabilitation seeking documents and information relevant to plaintiff's claims. In holding that the state could not be compelled to comply with the subpoena, the court stated that "when considering the application of the *Ex Parte Young* doctrine, the proper focus of the inquiry is whether the relief the plaintiffs seek is prospective, aimed at remedying an ongoing violation of federal law, or retrospective, aimed at remedying a past violation of the law. *Cardenas v. Anzai*, 311 F.3d 929, 935 (9th Cir. 2002)." *Id.* at 1229. The court further stated that:

> The Supreme Court has clarified "Young's applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Papasan v. Allain*, 478 U.S. 265, 277, 106 S.Ct. 2932, 92 L.Ed. 2932, 92 L.Ed.2d 209 (1986). Here Plaintiffs do not have a federal right to force the State to produce documents that, in a best case scenario, can only assist Plaintiff's in obtaining relief from a past wrong.

*Id.*, 466 F.Supp.2d at 1229.

The court also stated that it is the purpose of the relief rather than its form which is relevant. *Id.*, citing *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

In *Allen v. Woodford*, 544 F.Supp.2d 1074 (E.D.Cal. 2008), another district judge in the Eastern District of California rejected the reasoning and holding of *Estate of Gonzalez*. The

plaintiff in *Allen* also brought a § 1983 action against various state prison officials and employees.[3] The plaintiff served subpoenas on the custodians of records of various non-party state agencies involved in providing medical services to prison inmates.  In declining to follow *Estate of Gonzalez*, the court quoted its prior decision in the same case, 2007 WL 309945 at *3, in which it stated:

> Courts focus on the 11th Amendment's purpose to prevent federal court judgments that would have to be paid out of a State's treasury. "(T)he vulnerability of the State's purse (is) the most salient factor in Eleventh Amendment determinations." *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994); see also Alaska Cargo Transport, Inc. v. Alaska R.R. Corp. (9th Cir. 1993) 5 F.3d 378, 380.  Eleventh Amendment immunity depends on the State's potential legal liability, regardless of the entity's ability to require indemnification from a third party. ... Suits against state officials in their individual capacity for damages for violation of federal law (e.g., a federal civil rights suit) are not deemed actions against the state, and hence are not barred by the 11th Amendment.  *Scheuer v. Rhodes* (1974) 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 . . . .

*Allen*, 544 F.Supp.2d at 1076.

*Allen* also quoted from *Laxalt v. C.K. McClatchy*, 109 F.R.D. 632 (D.Nev. 1986) which upheld the enforceability of subpoenas to state officials under circumstances substantially similar to those in this case.  The plaintiff in *Laxalt* sued a newspaper publisher for defamation based on articles that reported alleged skimming at a casino that the plaintiff owned and which also alleged links between the plaintiff and organized crime.[4]  The plaintiff served a subpoena on the custodian of records of the Nevada Gaming Control Board to obtain records pertaining to plaintiff and certain business entities in which he had been a principle.  The Gaming Control Board moved to quash the subpoenas based sovereign immunity.  In holding that the subpoenas were not barred by the state's sovereign immunity, the court stated:

---

[3] *See Allen v. Woodford*, 2007 WL 309945, *1 (E.D.Cal. 2007) which provides the factual background of the case.

[4] The nature of the claims and jurisdictional facts are discussed in *Laxalt v. McClatchy*, 622 F.Supp. 737, 739 (D.Nev. 1985).

1

2

3

4

5

6

7

It is clear that the Eleventh Amendment establishes that a federal court has no jurisdiction over any lawsuit against a state. However, it has been construed to refer to assertions of liability on the state's part and claims for relief against it. *Johnson v. Lankford,* 245 U.S. 541, 545, 38 S.Ct. 203, 204, 62 L.Ed. 460 (1918); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984).  In *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 699, 102 S.Ct. 3304, 3322, 73 L.Ed.2d 1057 (1982), the plurality approved the service of process on state officials to secure possession of artifacts held by them. The analogy to the instant proceedings, where inspection and copying of State records is all that is being sought, is apparent. Magistrate Atkins' holding that the Amendment does not bar discovery is not contrary to law.

8

*Laxalt v. C.K. McClatchy*, 109 F.R.D. at 634-35.

9

The court in *Allen* noted that under *Hafer v. Melo*, 502 U.S. 21, 31, 112 S.Ct. 358, 116

10

L.Ed.2d 301 (1991), the Eleventh Amendment does not bar suits against state officials sued in their

11

individual capacities as "persons" within the meaning of § 1983.  The court further stated that "[it

12

is recognized that the immunity of a state arises "only when the state government (including state

13

agencies, not its political subdivision), is sued.  Rotunda and Nowak, Treatise on Constitutional

14

Law (4th ed. 2007), § 2.12(x), p. 210-11.  The court concluded:

15

16

17

18

19

20

21

22

23

Based on these principles, the Eleventh Amendment does not apply to preclude discovery from a State agency, which can only be obtained through the State's custodian of records or from other employees having custody and control of the information or documents sought.  Neither the State, nor any of its employees to whom subpoenas have been directed to obtain the information sought, that have been found essential to the prosecution of the Plaintiff's case, are parties, nor has any relief in law or equity been sought against them or the State.  No judgment will be issued in this action against the State that could have any conceivable effect on the State treasury; the State custodians are only subpoenaed to produce documents for use in the prosecution of this federal civil rights action.  The Non-Parties assertion that they must comply with the subpoenas in their official capacities as custodians of record is irrelevant; no judgment or other relief of any kind is sought against them in this litigation.

24

*Allen v. Woodford*, 544 F.Supp.2d at 1079.

25

Other courts agree with *Allen v. Woodford*.  In *Johnson v. Dovey*, 2011 WL 5374958, *2

26

(E.D.Cal. 2011), the court noted that *Allen* "provides a detailed analysis as to why *Estate of*

27

*Gonzalez* is erroneous."  In *Arista Records v. Does 1-14*, 2008 WL 5350246, *4-5 (W.D.Va. 2008),

28

the court discussed *Laxalt, Allen and Estate of Gonzalez* and concluded that *Laxalt and Allen*

9

1     represent the better approach.  The court noted that this appeared be an issue of first impression in

2     the Fourth Circuit and rejected the application of Fourth Circuit cases involving the sovereign

3     immunity of a non-party federal agency.  *Id.*  The court in *Ali v. Carnegie Institution of*

4     *Washington*, 306 F.R.D. 20, 30 n. 8 (D.D.C. 2014) cites *Arista* and *Allen* in support of the

5     conclusion that "'Eleventh Amendment sovereign immunity does not protect *non-party* state

6     entities from responding to [third party] discovery requests.'"

7           The Ninth Circuit's decisions in *Cook v. Avi Casino Enterprises, Inc.* and *Maxwell v.*

8     *County of San Diego* indicate that the purpose of tribal sovereign immunity is the same as that of

9     state sovereign immunity–to protect the Indian tribe's treasury.  It thus makes sense to apply the

10     same rule regarding the discovery of documents and information from tribal officers that applies to

11     discovery from state officers.  Although *United States v. James* arguably supports the conclusion

12     that a subpoena served on a tribal official is unenforceable, that case can be distinguished on the

13     grounds that it involved a criminal prosecution rather than a civil proceeding.  Even in the criminal

14     context, *James* has not been followed because it did not address the effect of the denial of discovery

15     on the defendant's Sixth Amendment rights.  *United States v. Juvenile Male 1*, 431 F.Supp.2d 1012

16     (D.Ariz. 2006).  More importantly, *James* did not expressly address the enforceability of subpoenas

17     served on individual tribal officers or employees in civil cases or the applicability of the *Ex Parte*

18     *Young* doctrine in such instances.  This Court believes the Ninth Circuit will adopt the view of the

19     courts in *Laxalt v. C.K. McClatchy* and *Allen v. Woodford* with respect to subpoenas served on non-

20     party state and tribal officers and employees.  The Court therefore concludes that tribal sovereign

21     immunity does not bar enforcement of the deposition subpoena served on Mr. Hallman.

22
23         **B.**      **Whether Mr. Hallman's Communications with Scutari & Cieslak are Protected from Disclosure by the Attorney-Client Privilege or Work-Product Doctrine.**

24           Plaintiffs' request to take Mr. Hallman's deposition arises from Scutari & Cieslak's

25     assertion that it relied on the advice of counsel as to the truthfulness of the allegedly defamatory

26     statements.  When a party alleges the "advice of counsel" defense, it waives its attorney-client

27     privilege with respect to the subject matter of the advice obtained.  *Wardleigh v. Second Judicial*

28     *Dist. Court*, 111 Nev 345, 891 P.2d 1180, 1186 (1995); *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615,

639-40 (D.Nev. 2013); and *Everest Indem. Ins. Co. v. Rea*, 342 P.3d 417, 418-20  (Ariz.App. 2015).[5]  Gallagher & Kennedy argues, however, that its communications with Scutari & Cieslak are protected from disclosure by the Hualapai Tribe's attorney-client privilege which Scutari & Cieslak has no authority to waive.

Nevada Revised Statute (NRS) 49.045 defines "client" as "a person, including a public officer, corporation, association or the organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him."  In the case of corporations or other entity clients, Nevada and Arizona apply the test adopted in *Upjohn Co. v. United States*, 449 U.S. 383, 389-97, 101 S.Ct. 677, 682-86 (1981) for determining whether the attorney-client privilege applies to communications with corporate employees.  *Wardleigh*, 891 P.2d at 1184-85; Arizona Revised Statutes (A.R.S.) § 12-2234.B; and *Salvation Army v. Bryson*, 273 P.3d 656, 661-662 (Ariz.App. Div.2 2012).  *Upjohn* holds that the privilege applies to communications with corporate employees, regardless of their position, when the communications concern matters within the scope of the employee's corporate duties and the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation.  *See Admiral Ins. v. United States Dist. Court for Dist. of Ariz.,* 881 F.2d 1486, 1492 (9th cir. 1989), *citing Upjohn, supra,* 449 U.S. at 294.  Each case must be evaluated to determine whether application of the privilege would further the underlying purpose of the attorney-client privilege to encourage candid communications between client and counsel.  *Upjohn,* 449 U.S. at 395.  *See also United States v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010).  The *Upjohn* test is applicable to confidential communications between counsel for a governmental entity and its employees.  *United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313, 2320 (2011) states that "'[t]he privilege aids government entities and employees in

---

[5] Plaintiffs assert that this action is governed by Nevada law which determines what privilege law applies. *Opposition (#21), pg. 13-14.*  Plaintiffs also assert that there is no conflict between Nevada and Arizona law on the application of the attorney-client privilege.  They therefore analyze the privilege issue under both Nevada or Arizona law.  *Id.*  Gallagher & Kennedy states that "[f]or purposes of this motion, we will accept that Nevada law applies, but the basic elements of the attorney-client privilege are the same under Arizona and Nevada law."  *Reply (#23), pg. 13.*

1   obtaining legal advice founded on a complete and accurate factual picture.' 1 Restatement (Third)

2   of the Law Governing Lawyers § 74, Comment *b*, pp. 573-574 (1998)."

3        The power to waive the attorney-client privilege rests with the corporation's or entity's

4   governing officers or directors who must exercise the privilege in a manner consistent with their

5   fiduciary duty to the corporation or entity. *Las Vegas Sands Corp. v. Eighth Jud. Dist. Ct.*, 130

6   Nev.Adv.Op. 69, 331 P.3d 905, 912 (2014), citing *Commodity Futures Trading Comm'n v.*

7   *Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986 (1985).  The Court in *Las Vegas Sands* declined to

8   adopt an exception to the privilege which would allow a former officer of a corporation to access

9   and use privileged information of the corporation after he or she becomes adverse to the

10  corporation.  *Id.*, 331 P.3d at 913.  *See also United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010)

11  (former employees of corporation had no right to assert the attorney-client privilege with respect to

12  confidential communications with the corporation's counsel, where the corporation had

13  affirmatively waived the privilege).

14        Courts are divided on whether the attorney-client privilege extends to communications

15  between a client's counsel and a public relations consultant that the client or its counsel hires to

16  assist in ongoing or anticipated legal matters or disputes.  In support of its position, Gallagher &

17  Kennedy relies on *In re Grand Jury Subpoenas Dated March 24, 2003 ("In re Grand Jury*

18  *Subpoenas")*, 265 F.Supp.2d 321 (S.D.N.Y. 2003); *F.T.C. v. Glaxosmithkline*, 294 F.3d 141

19  (D.C.Cir. 2002); and *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001).

20  In opposing the application of the privilege, Plaintiffs rely on *Scott v. Chipolte Mexican Grill Inc.*,

21  2015 WL 1424009, *3 (S.D.N.Y. 2015); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y.

22  2013); *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 54-55 (S.D.N.Y. 2000); *Fine v.*

23  *ESPN, Inc.*, 2015 WL 3447690, *11 (N.D.N.Y. 2015); and *McNamee v. Clemens*, 2013 WL

24  6572899, *1, 6 (E.D.N.Y. 2013).  The decisions cited by the parties chiefly emanate from federal

25  district courts in New York.  The Court has found two decisions from federal districts in other

26  circuits that also address this issue.  *See Hadjih v. Evenflo Company, Inc.*, 2012 WL 1957302

27  (D.Colo. 2012); and *Schaeffer v. Gregory Village Partners, L.P.*, 2015 WL 349039 (N.D.Cal.

28  2015).

The cases that support application of the attorney-client privilege to communications with public relations consultants retained by the party or its counsel do so on two grounds that are not necessarily mutually exclusive. Some courts find that in high profile cases a public relations strategy is an important element in the preparation or presentation of a party's claim or defense. These courts are therefore willing to extend the protection of the attorney-client privilege to a party's and its counsel's communications with a public relations consultant which are directed at supporting the client's legal position in the case or dispute. In *In re Grand Jury Subpoenas*, for example, the target of a grand jury investigation hired a public relations firm to assist in influencing the outcome of the investigation. The court noted that the investigation of the target had been a matter of intense press interest and extensive coverage for months. The government subpoenaed the public relations firm and its representative to produce documents and to testify before the grand jury regarding their communications with the target. In asserting the attorney-client privilege on behalf of the target, the public relations firm argued that the purpose of its public relations campaign was to counter unbalanced and inaccurate press reports about the target which created a risk that prosecutors and regulators would feel public pressure to bring charges. The campaign's objective was to neutralize the media environment so as to enable prosecutors and regulators to make decisions without undue influence from the negative press coverage. 265 F.Supp.2d 321 at 323. In upholding the assertion of the privilege, the court relied on the Second Circuit's decision in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) which concerned the application of the attorney-client privilege to communications with the client's accountant. The court in *Kovel* stated:

> "What is vital to the privilege is that the communications be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists. We recognize this draws what may seem to some a rather arbitrary line . . . . But that is the inevitable consequence of having to reconcile the absence of a privilege for accountants and the effective operation of the privilege of a client and lawyer under conditions where the lawyer needs outside help."

*In re Grand Jury Subpoenas*, 265 F.Supp.2d at 326, quoting *Kovel*, 296 F.2d at 922.

The court in *In re Grand Jury Subpoenas* held "that (1) confidential communications (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing

13

with the media in cases such as this (4) that are made for the purpose of giving or receiving advice (5) directed at handling the client's legal problems are protected by the attorney client privilege." 265 F.Supp.2d at 331.  The court stated that the privilege does not apply if the client, rather than the attorney, directly hires the public relations firm.  However, if the foregoing elements are met, the privilege applies to communications between the client and the public relations consultant as well as to communications between the lawyer and the public relations consultant.  *Id.*

In re Grand Jury Subpoenas distinguished an earlier decision from the Southern District of New York, *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000), which reached the opposite conclusion on whether the privilege applies.  As explained in *In re Grand Jury Subpoenas*, the plaintiff's attorney in *Calvin Klein* hired a public relations consultant in anticipation of the filing a high profile civil lawsuit.  The public relations consultant was hired to assist the lawyers in understanding the possible reaction of the plaintiff's various constituencies to the litigation, rendering legal advice, and ensuring that media interest in the action would be dealt with responsibly.  In rejecting the application of the privilege, the court found that few if any of the documents it reviewed *in camera* revealed communications that were made for the purpose of obtaining legal advice.  The evidence showed that the public relations firm, which had a pre-existing relationship with the client, was simply providing ordinary public relations advice.  *In re Grand Jury Subpoenas,* 265 F.Supp.2d at 328, citing *Calvin Klein*, 198 F.R.D. at 54-55.  The court in *In re Grand Jury Subpoenas* distinguished *Calvin Klein* on the grounds that the public relations consultant in that case had a pre-existing relationship with the plaintiff and because the scope of its public relations services addressed an array of constituencies, including customers and shareholders, that was consistent with providing ordinary public relations advice.  265 F.Supp.2d at 329.

Other courts have upheld the assertion of the attorney-client privilege to communications with a public relations consultant on the grounds that the consultant is the functional equivalent of the client's employee.  In *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, (S.D.N.Y. 2000), a foreign corporation was embroiled in a high profile scandal involving both regulatory and civil litigation aspects.  The corporation hired a public relations firm to act as its spokesperson with

14

1   the Western news media.  The public relations firm conferred frequently with the client's U.S.

2   litigation counsel in preparing drafts of press releases and other materials which incorporated the

3   lawyers' advice.  The court found under the circumstances of that case, that the public relations

4   firm was the functional equivalent of an in-house public relations department of the corporation.

5   200 F.R.D. at 219-220.

6          In *F.T.C. v. Glaxosmithkline*, 294 F.3d 141 (D.C.Cir. 2002) the court held that public

7   relations and governmental affairs consultants who assisted a drug manufacturer in a government

8   investigation regarding unfair competition were the functional equivalents of the manufacturer's

9   employees.  The court cited the manufacturer's affidavit which stated that its "corporate counsel

10  'worked with these consultants in the same manner as they d[id] with full-time employees; indeed

11  the consultants acted as part of a team with full-time employees regarding their particular

12  assignments' and, as a result, the consultants 'became integral members of the team assigned to

13  deal with issues [that] . . . were completely intertwined with [GSK's] litigation and legal

14  strategies.'"  The court stated that "[i]n these circumstances, 'there is no reason to distinguish

15  between a person on the corporation's payroll and a consultant hired by the corporation if each acts

16  for the corporation and possesses the information needed by the attorneys in rendering legal

17  advice.'"  *Id.*, 294 F.3d at 148.

18         In *Hadjih v. Evenflo Company, Inc.*, 2012 WL 1957302, *3 (D.Colo. 2012), the court stated

19  that the "functional equivalent" test requires the party asserting the privilege to make a detailed

20  factual showing.  The court noted that *Export-Import Bank v. Asia Pulp & Paper Co., Ltd.*, 232

21  F.R.D. 103, 113 (S.D.N.Y. 2005) has distilled the test down to three basic elements with respect to

22  outside consultants: (1) whether the consultant had primary responsibility for a key corporate job,

23  (2) whether there was a continuous and close working relationship between the consultant and the

24  company's principals on matters critical to the company's position in litigation, and (3) whether the

25  consultant is likely to possess information possessed by no one else at the company.  *Hadjih,* 2012

26  WL 1957302, at *3.  The court also referenced a four part test adopted by the Colorado Supreme

27  Court to determine whether communications between a government entity's counsel and an

28  independent contractor were protected by the privilege.  Under that test, the communication is

privileged if (1) the independent contractor had a significant relationship not only with the government entity, but also to the transaction which is the subject of the government entity's need for legal services; (2) the communication was made for the purpose of seeking or providing legal advice; (3) the subject matter of the communication was within the scope of the duties provided to the entity by the contractor; and (4) the communication was treated as confidential and only disseminated to those persons with a specific need to know its contents. *Id.*

The defendant corporation in *Hadjih* stated that the public relations consultant worked with its counsel and employees regarding its public relations strategy for the recall of certain products. The corporation did not have a public relations department, so the consultant served as the functional equivalent of one. In collaboration with the corporation's counsel, the consultant prepared a communications plan regarding the recall, which included drafting correspondence to NHTSA, as well as a press release and other communication to the public. The consultant incorporated input from Evenflo's officers, employees and counsel in the proposed communications. The court found that these representations met the required factual showing for the functional equivalent test. *Hadjih*, at *4.

In *Schaeffer v. Gregory Village Partners, L.P.*, 2015 WL 349039 (N.D.Cal. 2015), the plaintiffs sued defendant to obtain remediation of contamination at their home. Prior to the filing of the lawsuit, the defendant hired a public relations consultant to assist it in working with the regional water board regarding the possible contamination and the remediation steps that should be taken. The consultant participated in public meetings before the board and city with defendant's outside counsel. The consultant went door-to-door to meet with residents and secure inspection access agreements for defendant and to persuade residents to permit installation of depressurization systems in their homes. *Id.* The plaintiffs sought production of written communications between defendant's counsel and the consultant. The court noted the Ninth Circuit adopted the functional equivalent test in *United States v. Graf*, 610 F.3d 1148, 1156-59 (9th Cir. 2010). The court also cited *In re Copper Market Antitrust Litigation* and stated that:

> Under these precedents, Craig was a "functional employee" of
> Gregory Village. At the time she was hired, Gregory Village faced
> regulatory action by the Board in light of possible contamination at

16

the site, as well as potential litigation with neighbors whose
properties might have been contaminated. She also interacted with
neighbors—potential opponents in litigation, who turned out, at least
in this case, to be actual opposing litigants—to gather information
from them regarding their concerns about the contamination; to
secure access agreements so Gregory Village could perform on-site
sampling; to plan and execute sampling on site; and to attempt to
avoid litigation on behalf of Gregory Village by offering to install
depressurization systems to prevent contaminated vapor particles
from entering Plaintiffs' home. When attending public meetings,
interacting with neighbors, and otherwise being the face of the
company, Gregory Village's attorneys counseled her actions. In all
these activities, Craig acted as the public face of the company and
provided information to Gregory Village's legal staff that was useful
and necessary to evaluate legal strategy for the company going
forward. Craig acted as Gregory Village's functional employee for the
purposes of the attorney-client privilege.

*Schaeffer*, 2015 WL 349039, at *4.

Plaintiffs rely on other federal district court decisions from New York that apply a stricter

standard for application of the attorney-client privilege to communications with consultants. *Scott*

*v. Chipolte Mexican Grill, Inc.*, 2015 WL 1424009 (S.D.N.Y. 2015) involved claims against

defendant under the Fair Labor Standards Act ("FLSA") and whether a report prepared by a human

resources consultant regarding the classification of defendant's apprentice employees was

privileged from disclosure.  After discussing several district court cases and the Second Circuit's

decision in *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999), the court stated that the

"current interpretation of [*United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)] . . . is that 'the

inclusion of a third party in attorney-client communications does not destroy the privilege if the

purpose of the third party's participation is to improve the comprehension of the communications

between attorney and client.'" *Scott*, 2015 WL 1424009, at *4.  The court held the consultant's

report was not privileged because it did not provide any specialized knowledge that the attorneys

could not have acquired or understood on their own or directly through their client.  Emails

between defendant's employees also indicated the consultant's services were business related and

made no mention of the law or of legal advice.  Nor did the emails indicate that conversations with

the consultant would be privileged or should be kept confidential.  There was nothing to indicate

that the consultant took information that was incomprehensible to the attorneys and put it into a

usable form.  The court also found that the attorneys did not use the consultant's report to render

17

legal advice. Instead, after the defendant had received legal advice from two sources, the consultant provided the defendant with business advice on how it should classify its employees. *Id.* at *7.

In *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y. 2013), the counterclaimant retained a public relations firm to provide a variety of services, including those relating to the subject matter of an eventual lawsuit. 290 F.R.D. at 425-26. The court stated that under New York state law, the party asserting the privilege must show that disclosure to the third party was necessary for the client to obtain informed legal advice. The court further stated that the "[t]he necessity element means more than just useful or convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." (internal quotation marks omitted). *Id.* at 431. The court rejected as insufficient, the argument that the consultant was "contributing legal recommendations, providing next step action plans, and weighing strategic considerations in order to promote [counterclaimant's] overall legal goals." It also rejected the assertions that the consultant participated in the development of legal strategy, discussed legal options with the attorneys, or gave advice in determining the benefits of taking legal action. *Id.* at 431. The court stated that the mere fact that the consultant was inserted into the legal decision making process did not establish that his involvement was necessary. "Instead, it simply demonstrates the circumstances under which the waiver occurred." *Id.* The court also quoted *Hough v. Schroder Inv. Mgmt. N. Am. Inc.*, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) "that '[a] media campaign is not a litigation strategy[,]" and that while some attorneys may feel it is desirable at times to conduct a media campaign, that does not transform their coordination of a campaign into legal advice. *Id.* The court also cited *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 141 (N.D.N.Y. 2007) which stated that the agency exception is inapplicable to communications with a public relations firm "providing ordinary public relations advice and assist[ing] counsel in assessing the probable public reaction to various strategic alternatives." *Id.* at 432. *Egiazaryan* distinguished *In re Copper Market Antitrust Litigation* on the grounds that no corporation was involved in the case and there were no facts to suggest that the consultant was functioning as an entity that gave

18

direction to the counterclaimant's counsel in lieu of the client doing so.  *Id.* at 433.

In *Fine v. ESPN, Inc.*, 2015 WL 3447690 (N.D.N.Y. 2015), the plaintiff sued ESPN for defamation arising out of its coverage of sexual abuse allegations against a former employee of a state university.  The university retained counsel to investigate the sexual abuse allegations.  The attorney, in turn, retained a public relations consultant who worked at the direction of the university's lawyers and allegedly assisted them in providing legal advice to the university.  *Id.* at *3.  The university argued that the consultant worked with its counsel "'to ensure a cohesive approach to the University's response and related communications' surrounding the 2005 allegations . . .  and that the University's lawyers . . . later retained [the consultant] to continue its important role in assisting counsel in providing legal advice around communications and publicity."  *Id.*  The university also submitted affidavits from its counsel stating that the consultant had been retained early in the investigation (1) to neutralize negative media coverage, (2) because the District Attorney and United States Attorney had issued subpoenas to the university regarding the allegations, (3) the investigation attracted substantial press coverage, (4) the attorneys believed that a response to the media reports could affect the university's liability and (5) the attorneys consulted with the consultant on these matters, including the issuance of press releases that incorporated and reflected the legal advice and which required the sharing of privileged information.  In rejecting these arguments, the court noted that the university relied heavily on *In re Grand Jury Subpoenas.*  The court held, however, that under New York law, communications disclosed to a third party consultant must be necessary to facilitate attorney-client communications and for the provision of legal advice.  *Id.* at *11.  The communications did not meet that standard.  The court also rejected the argument that the communications were protected by the work-product doctrine.  The court found that the investigation was conducted for business purposes, rather than because the university reasonably anticipated that it could be sued.  *Id.* at *2, 6-8.

In *McNamee v. Clemens*, 2013 WL 6572899 (E.D.N.Y. 2013), the court also found that counsel's communication with a public relations consultant did not satisfy the requirement that they be necessary to facilitating communication between the attorney and the client.  The court found that the consultant performed standard public relations services in developing a public relations

campaign and media strategy primarily aimed at protecting the defendant's public image and reputation in the face of allegations that he used performance enhancing drugs.  The court also held the communications were not protected from disclosure under the work-product doctrine.  Based on its *in camera* review of allegedly privileged documents, the court found that litigation strategy was rarely mentioned and in those instances when it was brought up, it was contained within communications that predominantly focused on the public relations and media strategy.  *Id.* at *8.

As stated above, Nevada has adopted the *Upjohn* test for applying the attorney-client privilege to confidential communications with corporate employees.  The functional equivalent test extends *Upjohn* to agents where the circumstances indicate that they should be treated the same as employees.  This Court predicts the Nevada Supreme Court will apply the functional equivalent test in appropriate circumstances.  *See Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 632 (D.Nev. 2013) and *Residential Constructors, LLC v. Ace Prop. & Cas. Co.*, 2006 WL 3149362, at *15-16 (D.Nev. 2006) (discussing application of the functional equivalent test).  Arizona's attorney-client privilege statute makes the privilege applicable to confidential communications between an attorney for a corporation or entity "and any employee, *agent* or member of the entity or employer[.]"  Arizona Revised Statutes (A.R.S.) § 12-2234.B.  (Emphasis added).  Whether an agency relationship exists is a question of fact, but may be determined as a matter of law when the material facts are not in dispute.  *Salvation Army v. Bryson*, 273 P.3d 656, 663 (Ariz.App. 2012).

This Court also believes that the Nevada and Arizona courts will follow the reasoning of the courts in *In re Copper Market Antitrust Litigation*, *F.T.C. v. Glaxosmithkline*, *Hadjih v. Evenflo Company, Inc.*, and *Schaeffer v. Gregory Village Partners, L.P.* rather the reasoning of the courts applying the narrower New York state approach.  An attorney for a corporation or governmental entity should be able to provide confidential legal advice to employees or agents in performing their duties on behalf of the corporation or governmental entity.  In the case of a public relations consultant who is hired to conduct a media relations campaign on behalf of the client with respect to a lawsuit or legal dispute, it is important that the client's counsel be able to provide confidential legal advice to the consultant so that he can perform his duties on behalf of the client in accordance with that legal advice.

20

There is little doubt that Scutari & Cieslak should be treated as the functional equivalent of an employee of the Hualapai Tribe under the factors considered in the foregoing cases.  In its opposition to the prior motion to quash the subpoena duces tecum, Scutari & Cieslak acknowledged that it was hired by the Tribe, through its counsel, to protect the name of the Tribe and make it look more reasonable in the eyes of the public.  *Opposition to Motion to Quash (#9),* Case No. 2:15-cv-00663-JAD-GWF, pgs. 3-4.  Scutari & Cieslak stated that during its initial meeting with the Tribe's attorneys:

> They methodically walked S&C through each provision of the [2003 Skywalk Management Agreement between the Tribe and Grand Canyon Skywalk Development, LLC], focusing on specific provisions and providing G&K's legal analysis establishing that Mr. Jin was responsible for the site utilities and the Visitor's Center. S&C obtained all information, including the verification of such information from G&K.  In fact, before S&C could speak with the Tribe, G&K had to 'vet' Third-Party Plaintiffs.  Further, G&K not only served as the gatekeeper to the Tribe, but also as the law firm that reviewed and approved the Communications and Public Relations Agreement eventually entered into between the Tribe and Third-Party Plaintiff.

*Id.* at 4.

The allegations in Plaintiff's complaint also indicate that Scutari & Cieslak's public relations services were directed at portraying Plaintiffs as the parties who breached the contract with the Tribe, and in portraying the Tribe and its officers as having acted properly in the legal dispute.  There is no evidence that Scutari & Cieslak undertook to provide general public relations services to the Tribe beyond the legal dispute with the Plaintiffs.  Under these circumstances, the confidential legal advice that Gallagher & Kennedy provided to Scutari & Cieslak with respect to the legal dispute is within the scope of the attorney-client privilege and is protected from disclosure unless the privilege has otherwise been waived by the Tribe.

The Tribe's refusal to waive the privilege under these circumstances is likely to be prejudicial to Scutari & Cieslak.  Scutari & Cieslak should not be permitted to rely on the advice of counsel defense if Plaintiffs are prevented from exploring the legal advice that was allegedly

. . .

. . .

provided.[6]  There may, however, be an issue whether the Tribe has waived its attorney-client

privilege in this matter by failing to assert it in a timely manner.  *See United States v. SDI Future*

*Health, Inc.*, 464 F.Supp.2d 1027, 1041 (D.Nev. 2006); *S.E.C. v. McNaul*, 277 F.R.D. 439, 443

(D.Kan. 2011); and *Maplewood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 583

(S.D.Fla. 2013).  Implied waiver is usually found where a party fails to assert the privileges in its

responses to discovery requests.  As *United States v. SDI Future Health, Inc.* indicates, other

circumstances may also give rise to a finding of waiver based on the privilege holder's failure to

assert it.

Plaintiffs state in their opposition to the instant motion to quash the subpoena to Mr.

Hallman that "S&C has disclosed thousands of pages of emails between S&C, the Tribe, and/or

Gallagher & Kennedy, and have been deposed both individually and through a Person Most

Knowledgeable regarding their discussions with Gallagher & Kennedy and the Tribe.  S&C is

relying upon the "advice of counsel" defense, putting these conversations directly at issue in this

lawsuit."  *Opposition (#21) pg. 4.*  In Scutari & Cieslak's earlier opposition to Gallagher &

Kennedy's motion to quash the subpoena duces tecum, Scutari & Cieslak also stated:

> [D]iscovery to date clearly shows over 1000 pages of email
> communications that many of the allegedly defamatory statements
> asserted in the pending Nevada litigation were approved, redrafted,
> validated and/or endorsed by G&K attorneys.  However, this only
> scratches the surface as to G&K's involvement.  Discovery to date
> also shows that G&K considered S&C a trial consultant/expert and
> thus covered under the attorney-client privilege.  *Exhibit D*.
> However, S&C was never told of this status.

*Opposition to Motion to Quash (#9)*, Case No. 2:15-cv-00663-JAD-GWF, pgs. 4-5.

It is unclear whether the Tribe or Gallagher & Kennedy notified Scutari & Cieslak of its

assertion of the attorney-client privilege or work-product doctrine prior to objecting to Scutari &

---

[6]  The Tribe's refusal to waive its attorney-client privilege under the circumstances of this case certainly appears unreasonable and unfair to its agent Scutari & Cieslak.  The Tribe's sovereign immunity protects it from potential liability to the Plaintiffs and, perhaps, from being required to fulfill its contractual agreement to indemnify Scutari & Cieslak.  Secure in its own immunity, the Tribe may not be concerned about Scutari & Cieslak's potential liability.  It appears unjust, however, for the Tribe to refuse to waive its attorney-client privilege which would permit Scutari & Cieslak to rely on the advice it received from The Tribe's counsel in defense to Plaintiffs' claims.  The application of the attorney-client privilege does not depend, however, on whether the Court views its assertion in a particular case to be reasonable or fair.

1    Cieslak's subpoena duces tecum and the filing of the motion to quash that subpoena.  If the Tribe or

2    its counsel were on notice that allegedly privileged communications had been disclosed and were

3    being used by Scutari & Cieslak in this action, and did nothing to assert the privilege with respect

4    thereto, grounds for finding a waiver of the privilege may exist.  Additionally, in its motion to

5    quash the subpoena duces served on it by Scutari & Cieslak, Gallagher & Kennedy stated only that

6    the documents requested by Scutari & Cieslak were "privileged," but did not set forth any

7    arguments regarding the attorney-client privilege or work-product doctrine.  *See Motion to Quash*

8    *(#1)*, Case No. 2:15-cv-00663-JAD-GWF.  In its opposition to that motion to quash, Scutari &

9    Cieslak disputed any claim that the subpoenaed documents were protected from disclosure by the

10    attorney-client privilege or work-product doctrine. *Opposition to Motion to Quash (#9), pgs. 9-13.*

11    Gallagher & Kennedy then argued in its reply that the documents were protected from disclosure by

12    the attorney-client privilege and the work-product doctrine. *Reply (#15), pgs. 6-8.*  The

13    undersigned magistrate judge declined to decide whether the documents were privileged because

14    Gallagher & Kennedy did not adequately raise the issue in its motion. *Order (#28), pg. 14.*  In its

15    objection to that order, Gallagher & Kennedy argues that the Court should have decided the

16    privilege issue because Scutari & Cieslak raised it in its opposition to the motion and it was

17    addressed by Gallagher & Kennedy in its reply. *Objection (#29), pgs. 7-8.*  Gallagher & Kennedy's

18    objection is currently pending before the District Judge.

19    **CONCLUSION**

20        The Court concludes that the doctrine of tribal sovereign immunity does not preclude the

21    taking of the deposition of attorney Glen Hallman in regard to his communications with Scutari &

22    Cieslak.  The Court concludes, however, that confidential communications in which Mr. Hallman

23    provided legal advice to Scutari & Cieslak regarding the statements that the latter subsequently

24    made about Plaintiffs are within the scope of the Tribe's attorney-client privilege.  At the time such

25    communications occurred, Scutari & Cieslak was the functional equivalent of a tribal employee and

26    the legal advice appears to have been provided with respect to its actions on behalf of the Tribe or

27    its officers.

28    . . .

The factual record is insufficient at this point to support a finding that the Tribe waived its attorney-client or work-product privileges by failing to assert them in a timely manner. Nor has this argument been clearly raised by Plaintiffs or Scutari & Cieslak. Before entertaining any such argument, the Court should also await the District Judge's decision on Gallagher & Kennedy's objection to Order (#28) in Case No. 2:15-cv-00663-JAD-GWF. Given the prejudice that Scutari & Cieslak will suffer if the Tribe's assertion of privilege is upheld, however, the Court will not preclude Scutari & Cieslak or Plaintiffs from filing a motion asserting that the Tribe waived its privileges by failing to assert them in a timely manner.

There is no indication that the parties wish to take Mr. Hallman's deposition if they cannot inquire into the legal advice he allegedly gave Scutari & Cieslak with respect to the allegedly defamatory statements. This order, however, does not preclude the taking of Mr. Hallman's deposition with respect to his knowledge of relevant, nonprivileged information. Accordingly,

**IT IS HEREBY ORDERED** that Gallagher & Kennedy, P.A. and The Hualapai Indian Tribe's Motion to Quash Plaintiff's Subpoena to Glen Hallman (#1) is **granted** in accordance with the foregoing provisions of this order. The granting of this motion is without prejudice to the filing of a motion by Plaintiffs or Scutari & Cieslak that the Hualapai Tribe waived its privileges by not asserting them in a timely manner.

DATED this 13th day of August, 2015.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge